NOT DESIGNATED FOR PUBLICATION

No. 123,601

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

YORDY GAMEZ OLIVER,
*Appellee*,

v.

NATIONAL BEEF PACKING CO. and AMERICAN ZURICH INSURANCE CO.,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed December 17, 2021. Affirmed.

*Shirla R. McQueen*, of Sharp McQueen, P.A., of Liberal, for appellants.

*Conn Felix Sanchez*, of Kansas City, for appellee.

Before MALONE, P.J., POWELL and CLINE, JJ.

PER CURIAM: While employed by National Beef Packing Co. (NBP), Yordy Gamez Oliver injured his back on the job. He filed a workers compensation claim and underwent back surgery. Several months after the surgery, and while his workers compensation claim was pending, NBP terminated Oliver for violating the work restrictions imposed by his doctor. Oliver's supervisor had observed Oliver kneeling, reaching under a table to retrieve a glove off the floor with a long hook. Oliver's work restrictions prohibited him from kneeling.

The administrative law judge (ALJ) awarded Oliver permanent partial disability compensation for his back injury, but only through the date of his termination since she

1

found NBP terminated Oliver for cause. Oliver appealed to the Workers Compensation Appeals Board (the Board), who found that Oliver was not terminated for cause and modified the ALJ's award. NBP now appeals, arguing the Board's finding that Oliver was not terminated for cause is without evidentiary support and the Board misapplied or misinterpreted the law in reaching this conclusion. Finding no error, we affirm.

FACTS

Oliver began working at NBP in 2009. After quitting briefly in 2011, he worked for NBP continuously until his termination in 2017. In 2013, Oliver fell at work and cracked three vertebrae in his lower back. Oliver reported the accident and received medical treatment for his injury but did not initially undergo surgery. He filed a workers compensation claim in May 2014 for this injury.

Oliver was given work restrictions because of his injury, and NBP assigned Oliver to a series of positions to accommodate these restrictions. In early 2017, NBP assigned Oliver to work in the "glove room."

Oliver eventually underwent surgery to address his back injury in February 2017. After this surgery, Oliver's doctor issued him new job restrictions. When he registered these restrictions with NBP, Oliver signed a document containing an admonition that if he voluntarily exceeded his restrictions, it would be considered a safety violation and would lead to disciplinary action.

Oliver was terminated by NBP in September 2017 for a "safety violation" after NBP determined he had committed an "egregious violation" of his work restrictions. A safety manager observed him kneeling, reaching under a table to retrieve a glove off the floor with a long hook. Oliver's work restrictions prohibited him from kneeling. His workers compensation claim was still pending at the time.

2

In August 2020, the ALJ found that Oliver was entitled to 83 weeks of permanent partial disability compensation, awarding Oliver $48,721. But the ALJ refused to award Oliver compensation for the period after his termination because she found that Oliver had been terminated for cause. She found that NBP had been accommodating Oliver's restrictions before his termination and would have continued to accommodate these restrictions, had he not been terminated. The ALJ also found that Oliver was not permanently and totally disabled and was not entitled to temporary total disability between September 2017 and May 2019. She found he was entitled to future medical treatment only upon proper application to and approval by the Director of Workers Compensation. Oliver appealed these findings to the Board.

The Board modified the ALJ's award, concluding that NBP did not terminate Oliver for cause. Rather, the Board found that NBP's actions could "be construed as simply getting rid of a troublesome employee to avoid paying [Oliver] work disability payments." The Board noted Oliver's act of kneeling was "at most a brief lapse in judgment or an inadvertent reaction," and the timing of Oliver's disciplinary citations was suspect, given their proximity to his surgery. The Board accordingly found that Oliver was entitled to 86.86 weeks of temporary total disability and 125.53 weeks of permanent partial disability, awarding Oliver $86,687.07.

ANALYSIS

NBP now challenges how the Board weighed the evidence when it determined Oliver was not terminated for cause. NBP first alleges the Board's finding is not supported by substantial competent evidence. NBP bases this contention mainly on its argument that Oliver lacked credibility, so the Board should not have relied on his testimony. After discounting Oliver's testimony, NBP claims the remaining evidence supports a finding that Oliver was terminated for cause. NBP's arguments are misplaced, however, for two reasons:  (1) The Board did not rely on Oliver's testimony in making its

3

findings and (2) we may not reweigh the evidence when conducting our review under the Kansas Judicial Review Act, K.S.A. 77-621(d).

To begin with, we can reject NBP's first argument—that the Board should not have relied on Oliver's testimony—out of hand. The Board did not rely on Oliver's testimony in finding that he was not terminated for cause. The Board relied instead on NBP's version of events—that Oliver had violated his work restrictions by kneeling to pick up a glove and had acknowledged this fact to NBP. Even so, relying on this version of events, the Board found that Oliver's violation of his work restrictions was inadvertent and not in bad faith. Given this, along with the timing of Oliver's cited violations, the Board concluded it was more likely that NBP terminated Oliver to avoid disability payments rather than for cause.

NBP's argument also fails because we may not reweigh the evidence. Under K.S.A. 77-621(c)(7), we may grant NBP relief if we determine the Board's finding was not supported by substantial evidence, when viewed in light of the record as a whole. Our task on review is not to reweigh the competing evidence, but rather to focus on the Board's material findings in light of the record as a whole and to examine the Board's explanation of why the relevant evidence in the record supports those findings. *Rausch v. Sears Roebuck & Co.*, 46 Kan. App. 2d 338, 343-44, 263 P.3d 194 (2011).

When reviewing an agency action under K.S.A. 77-621(c)(7), we are limited to ascertaining from the record if substantial competent evidence supports the agency's findings. *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 326-27, 393 P.3d 601 (2017). Substantial evidence is legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). K.S.A. 77-621(d) dictates how to conduct substantial evidence review under K.S.A. 77-621(c)(7), providing:

4

"For purposes of this section, 'in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

Subsection (d) affects our analysis in three ways: "(1) It requires review of the evidence both supporting and contradicting the Board's findings; (2) it requires an examination of the presiding officer's credibility determination, if any; and (3) it requires review of the agency's explanation as to why the evidence supports its findings." *Redd v. Kansas Truck Center*, 291 Kan. 176, 182, 239 P.3d 66 (2010).

In the workers compensation context, the "presiding officer" is the ALJ, while the decision under review is that of the Board, which was not the fact-finder but has itself reviewed the ALJ's decision on the record. *Rausch*, 46 Kan. App. 2d at 342.

As the party appealing from the Board's ruling, NBP bears the burden of proof. K.S.A. 77-621(a)(1).

To properly review the evidence both supporting and contradicting the Board's findings, we consider the facts surrounding Oliver's termination which were before the Board.

First, Oliver's termination report cites "safety violation" as the reason NBP fired him. This report states that Oliver committed an "egregious violation of work

5

restrictions" on September 8, 2017. NBP contends it also considered two prior citations Oliver received for misconduct in its termination decision: (1) a citation in January 2017 for sleeping in a work area and (2) a citation in April 2017 for leaving his work area without his supervisor's authorization.

Karl Ulibarri, the human resources director for NBP, participated in the decision to fire Oliver. Ulibarri testified that NBP's disciplinary response to an employee violating his work restrictions varied, depending on the severity of the violation. NBP can discharge an employee who willfully and intentionally violates his medical restrictions. NBP construes such a violation as insubordination. Ulibarri noted that after Oliver's first two disciplinary violations, Oliver was given warnings by NBP. NBP's workers compensation coordinator, Selena Sena, testified that NBP's policy towards disciplinary violations is that ordinarily an employee will receive written warnings for the first two violations of NBP policy, with a third violation subjecting the employee to possible termination.

*Citation for Sleeping*

Gonzalo Hernandez De La Torre, a supervisor at the plant, observed and reported the first incident of misconduct. Hernandez said he observed Oliver sleeping during work hours on January 19, 2017. When pressed by Oliver's counsel whether it was indeed work hours when this occurred, Hernandez testified that he saw Oliver sleeping at 8:56 a.m., when it was not yet break time. Hernandez said he used his phone to photograph Oliver sleeping. Hernandez did not say whether he ever tried to confirm that Oliver was asleep. He admitted he knew Oliver "was injured" but said he did not know Oliver's specific work restrictions.

One of Oliver's coworkers provided a statement as part of NBP's investigation of the reported misconduct. This employee reported seeing Oliver with his head down when

he entered the glove room. But this employee also said he assumed it was break time when he entered the room since Oliver was the only worker in there.

The same day, Oliver provided a statement to his supervisors describing what happened. Oliver said he and his coworkers were on a scheduled 15-minute break when Hernandez saw him. He insisted he was not sleeping but had only laid his head on the table. Oliver reported the rest of his coworkers had gone to take their break in the cafeteria, but he stayed in the work area as he usually did, since his back injury made it difficult to use the flight of stairs that led to the break area. Oliver also testified that at the time, his work restrictions did not allow him to use stairs. Oliver's work restrictions on file instructed Oliver to use stairs "rarely."

Statements from other coworkers also supported Oliver's version of events. They wrote that Oliver sometimes stayed behind while the rest of the glove room staff went on break. On that day, the workers in the glove room went on a scheduled 15-minute break, but Oliver stayed behind, and he was awake when they left him. One of the workers also said the timing of their scheduled breaks varied, and sometimes they would be sent to break a few minutes early.

NBP ultimately reprimanded Oliver for sleeping in his work area, rather than for sleeping during work hours. NBP supervisors met with Oliver to discuss this citation. NBP's record of this meeting notes NBP told Oliver he could not take his 15-minute breaks in his work area, he could only sleep at work while on break, and at no time could he sleep in his work area. NBP also advised Oliver that if he did it again he could be fired.

The NBP employee rules of conduct prohibit "sleeping on the job." While these rules note the listed examples of misconduct are not exclusive, they do not delineate NBP's policy on where an employee may take his breaks.

*Citation for Leaving Work Area*

The only facts in the record relating to Oliver's second citation come from a one-page violation report generated by NBP. This report noted that NBP cited Oliver on April 28, 2017, for leaving his work area without his supervisor's authorization.

*Citation for Kneeling*

Oliver's third and final misconduct violation occurred on September 8, 2017. Joe Davis, the safety manager for NBP, observed and reported the violation. Davis testified that as he walked past the door to the glove room, he glanced into the room and noticed somebody kneeling and reaching under the glove sorting table. He stopped and waited for the individual to stand up so that he could identify him, as he knew most of the employees assigned to work in that area had work restrictions. After identifying Oliver as the kneeling individual, Davis went to the nurse's office to verify that kneeling violated Oliver's work restrictions and reported what he saw.

Later that day, Davis, along with other NBP supervisors, met with Oliver. Oliver told his supervisors that when Davis saw him kneeling, he was assisting another employee, using a hook to pick up a single glove that had fallen under the table and "he was just trying to help the company." The supervisors asked Oliver to sign a statement written in Spanish about the incident, which he did. The translation of this statement provided by NBP reads: "I was on my knees to pick up some gloves with the hook. This was the only time that I did it today. I know that it is against my restrictions."

Oliver testified that when he met with NBP supervisors he told them it was the first and only time he violated his work restrictions. He said he signed the statement because his supervisor, Jennifer Barnes, told him he would be suspended only for a week if he did so. Barnes testified she did not recall the meeting with Oliver but denied she

8

would tell an employee under investigation he could avoid being fired by writing such a statement.

Davis, along with other NBP supervisors, also interviewed several glove room employees and asked them to write statements describing what they saw. One employee reported: "[Oliver] does not take out the gloves from down the table, he did it for me to help me take those out." This employee later testified she was working with Oliver the whole day, and he was not kneeling but sitting when he reached under the table with the hook to retrieve the glove. Another employee noted: "Since I'm in there I haven't seen anyone to bend down to take gloves or being on their knees, just today I saw the gentleman that he did it, I don't know what is his name." A third employee reported that "Norma picks up the glove that fall to the floor with a long hook. I have not seen anyone sitting on their knees picking up gloves from the floor."

*Inconsistent Enforcement*

Oliver also alleged that before his termination, NBP enforced violations of its safety policies inconsistently. Oliver testified NBP had assigned him jobs that required him to violate his work restrictions. He said after his surgery NBP first asked him to perform a job which required him to wear heavy equipment and move entire cow carcasses, although his work restrictions forbade him from moving anything over 40 pounds. Oliver also alleged the only employee bathroom available to him required him to use stairs. Oliver's work restrictions following his surgery forbade him from using stairs at any time. He testified NBP did not allow him to use the nurse's bathroom or the bathroom for office workers on the same floor as his work area, which forced him to use his 30-minute breaks to travel home to use the restroom. Oliver admitted, however, that he could use the nurse's restroom for at least part of this period. Oliver also testified that supervisors asked him at one point after his surgery to perform a job where he would have to move heavy ropes, which would require him to violate his restrictions. Oliver

9

alleged the supervisors insisted he perform the job even after he told them it would violate his restrictions, and only relented after he called their bluff when they threatened to report him to the personnel office if he refused to comply.

Sena denied knowledge of these events and claimed Oliver would have been allowed to use the restroom in the nurse's office, since that did not require him to use any stairs. She also testified Oliver could have filed a formal complaint if NBP asked him to work outside his restrictions.

The evidence contradicting the Board's ruling is straightforward. NBP terminated Oliver after his third conduct violation, in accordance with NBP's policies. His work restrictions prohibited him from kneeling. The work restriction sign-off sheet, which Oliver signed, listed his work restrictions and noted NBP would consider voluntarily exceeding restrictions a safety violation which would lead to disciplinary action. Oliver acknowledged in a signed statement that he indeed had knelt while retrieving the glove and that he was aware this violated his work restrictions.

Much of the evidence, however, supports the Board's finding that NBP did not fire Oliver for cause. The timing and circumstances of Oliver's cited violations support the Board's finding that his termination was an attempt by NBP to reduce their disability payments, rather than for cause. Oliver had worked for NBP for nearly eight years when he was fired. NBP did not cite him for any misconduct until the eight-month period surrounding his surgery. His first violation occurred roughly three weeks before his surgery, and his second and third violations occurred after the surgery. Furthermore, each of Oliver's violations involved seemingly minor instance of misconduct. On this record, the Board's determination was not unreasonable.

Next, K.S.A. 77-621(d) requires an examination of the ALJ's credibility determinations, if any. Here, the ALJ did not make any credibility determinations related to the issue on appeal.

Last, K.S.A. 77-621(d) demands a review of the Board's explanation for why the evidence supports its findings. The Board found that Oliver's violation of his work restriction was at most a brief lapse in judgment or an inadvertent reaction, but not an act of bad faith on his part. The Board stated that Oliver's job was to sort gloves, and Oliver testified that although he knew he was prohibited from kneeling, he was only trying to do his job. The Board also found NBP did not terminate Oliver in good faith but that NBP's actions could be construed as an attempt to avoid paying Oliver work disability benefits. In support of this finding, the Board pointed to the minor and inadvertent nature of Oliver's violation, combined with the timing of NBP's disciplinary actions against Oliver. The Board also relied on the fact that all of Oliver's disciplinary actions occurred in 2017 after Oliver was placed on work restrictions for his injury.

Based on this record, we find substantial competent evidence supports the Board's findings. There is sufficient evidence in the record for a reasonable person to conclude Oliver was not terminated for cause, given the timing and circumstances of the violations cited by NBP. In light of the record as a whole, the Board could reasonably conclude that NBP did not terminate Oliver in good faith, but in an attempt to avoid work disability payments.

NBP next argues the Board misapplied or misinterpreted existing law in finding that Oliver was not terminated "for cause." Under K.S.A. 77-621(c)(4), we may grant NBP relief if the Board erroneously interpreted or applied the law in making this finding. As the party appealing from the Board's ruling, NBP bears the burden of proof. K.S.A. 77-621(a)(1).

11

K.S.A. 2020 Supp. 44-510e provides for the determination of weekly compensation for employees suffering from temporary or permanent partial general disability. K.S.A. 2020 Supp. 44-510e(a)(2)(E)(i) states that "[w]age loss caused by . . . termination for cause shall in no way be construed to be caused by the injury." K.S.A. 2020 Supp. 44-510c(b)(2)(C) further provides that "[i]f the employee has been terminated for cause or voluntarily resigns following a compensable injury, the employer shall not be liable for temporary total disability benefits if the employer could have accommodated the temporary restrictions imposed by the authorized treating physician but for the employee's separation from employment." Essentially, the Kansas Worker's Compensation Act (the Act) excuses an employer from having to compensate a disabled employee for wage loss suffered from a termination "for cause" if the employer could have continued to accommodate the worker absent the termination. The Act does not define the term "for cause." *Dirshe v. Cargill Meat Solutions Corp.*, 53 Kan. App. 2d 118, 122, 382 P.3d 484 (2016).

NBP argues the Board misapplied or misinterpreted the Act in finding that Oliver was not terminated for cause, "given that the weight of the evidence clearly establishes that Oliver was terminated 'for cause.'" Essentially, NBP argues the Board ignored the above provisions of the Act in determining that Oliver's termination was not for cause because the record shows that he violated NBP policies many times. In support of this argument, NBP cites *Dirshe*, 53 Kan. App. 2d at 122-23, where another panel of this court upheld the Board's finding that an employee was terminated for cause where the employee was fired for poor job performance and had been cited for other infractions.

NBP is simply re-hashing its argument that the Board's findings were not supported by the facts. Both parties agree the Board applied the correct standard in determining that Oliver was not terminated for cause:

"[T]he proper inquiry to make when examining whether good cause existed for a termination in a workers compensation case is whether the termination was reasonable, given all of the circumstances. Included within these circumstances to consider would be whether the claimant made a good faith effort to maintain his or her employment. Whether the employer exercised good faith would also be a consideration. In that regard, the primary focus should be to determine whether the employer's reason for termination is actually a subterfuge to avoid work disability payments." *Morales-Chavarin v. National Beef Packing Co.*, No. 95,261, 2006 WL 2265205, at *5 (Kan. App. 2006) (unpublished opinion).

The Board, applying this standard, found that NBP did not terminate Oliver in good faith, but terminated his employment as a subterfuge to avoid work disability. In making this finding, the Board considered the circumstances surrounding the three disciplinary violations but concluded that NBP did not fire Oliver for cause. We find the Board correctly applied the law in finding that Oliver was not terminated for cause.

Affirmed.